# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ANTHONY PRICE, et al.,            :
                               :
                               :
      v.                        :         Civil No. CCB-14-763
                               :
                               :
BERMAN'S AUTOMOTIVE, INC.     :
                               :

## MEMORANDUM

This case arises from the purchase by Anthony J. Price and Virginia K. Aldrich ("the plaintiffs") of a used Jeep from Berman's Automotive Inc. ("the Dealership"), a Baltimore car dealership. In their five-count amended complaint, the plaintiffs allege, among other things, that the Dealership failed to properly disclose the content of an agreement financing the plaintiffs' purchase of the Jeep, and that two Dealership employees orally misrepresented its monthly payment terms. They also seek compensation based on their post-purchase discovery that the Dealership advertised the Jeep on the internet for a lower price. Before the court are the Dealership's motion to dismiss the plaintiffs' original complaint or in the alternative for summary judgment, (ECF No. 3), the Dealership's motion to dismiss the plaintiffs' amended complaint or in the alternative for summary judgment, (ECF No. 7), and the plaintiffs' response to the motion to dismiss their amended complaint and cross motion for summary judgment, (ECF No. 8). The court finds oral argument unnecessary to resolve the issues. *See* Local R. 105.6 (D. Md. 2011). For the reasons that follow, the court will deny as moot the Dealership's motion to dismiss the plaintiffs' original complaint, grant in part and deny in part the Dealership's motion to dismiss, and deny the plaintiffs' cross motion for summary judgment.

## BACKGROUND

On February 25, 2014, the plaintiffs went to the Dealership and decided to buy a 2003 Jeep Grand Cherokee ("the Jeep").[1]  (Am. Compl. ¶¶ 8, 12, ECF No. 6.)  They could not pay the Jeep's full price in cash, and so began to discuss a financing arrangement with the Dealership. (*Id.* ¶¶ 7-8.)  They told a Dealership salesperson "they could not afford payment[s] greater than $300.00 per month and he replied the payments would be about $300.00 - $301.00 a month for 36 months," or about $10,800 in total.[2]  (*Id.* ¶ 7.)  A female "[f]inance [p]erson" produced a Retail Installment Sales Contract ("RISC").  (*Id.* ¶ 9.)  Before signing the RISC the plaintiffs asked her if the monthly payments were under $300, and she said "words to [the] effect [that] once the balance of the down payment is made it will be right around $300.00 per month."  (*Id.*) The finance person then "held [the RISC] in her hand . . . and told [the] plaintiffs where to sign or initial," saying "initial here, initial there," and "sign here[,] sign there."  (*Id.* ¶ 10.)  In doing so, she "only exposed the area of each sheet of paper that required [the] plaintiffs' initial[s] and/or signature."  (*Id.* ¶ 11.)  She "retained control of each sheet of paper[,] precluding [the] plaintiffs from reading the documents," and did not "provide the documents to [the] plaintiffs for review prior to or during [their] execution" of the RISC.  (*Id.* ¶ 10.)

Following their execution of the RISC but "[d]uring the same transaction," the plaintiffs signed a one-page down payment agreement.  (*Id.* ¶ 62; ECF No. 8-5 (down payment

---

[1] The court takes as true the allegations in the plaintiffs' amended complaint for purposes of resolving the Dealership's motion to dismiss.  The court declines to construe the Dealership's motion to dismiss as a motion for summary judgment because further development of the factual record would aid the court in resolving the issues. The court further declines to recognize the plaintiffs' cross motion for summary judgment as such a motion because they have failed to identify the claims on which they seek summary judgment, and have not shown that there is no genuine dispute as to any material fact.  *See* Fed. R. Civ. P. 56(a).

[2] The plaintiffs' assertions in their affidavits that they would not have purchased the Jeep had they known its price was $9,696, (Price Aff. ¶ 10, ECF No. 8-17; Aldrich Aff. ¶ 10, ECF No. 8-18), therefore are difficult to understand.

agreement).)  The down payment agreement clarified that though the full down payment was

$2,000, the plaintiffs would pay $1,200 that day, and the remaining $800 would be "deferred"

until March 11, 2014.  (*Id.*)

     Later that evening, the plaintiffs "saw on the Internet that the [Jeep] was advertised for

$5,995.00."  (Am. Compl. ¶ 17.)   They also reviewed the RISC, and "for the first time saw that

[the Dealership] wrote on the RISC there would be 12 monthly payments at $882.31 per month

rather than the agreed 36 monthly payments at approximately $300 per month."  (*Id.* ¶ 18.)

They returned to the Dealership the following morning and spoke with the same finance person,

asking her why the price the Dealership charged them was so much higher than the advertised

price.  (*Id.* ¶ 19.)  She said the reason was "because they did not purchase [the Jeep] on the

Internet."  (*Id.*)

## ANALYSIS

**Motion to Dismiss Standard**

     When ruling on a motion under Rule 12(b)(6), the court must "accept the well-pled

allegations of the complaint as true," and "construe the facts and reasonable inferences derived

therefrom in the light most favorable to the plaintiff."  *Ibarra v. United States*, 120 F.3d 472, 474

(4th Cir. 1997).  "Even though the requirements for pleading a proper complaint are substantially

aimed at assuring that the defendant be given adequate notice of the nature of a claim being

made against him, they also provide criteria for defining issues for trial and for early disposition

of inappropriate complaints."  *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).  "The

mere recital of elements of a cause of action, supported only by conclusory statements, is not

sufficient to survive a motion made pursuant to Rule 12(b)(6)."  *Walters v. McMahen*, 684 F.3d

435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To survive a

motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief

above the speculative level on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal

citations omitted).  "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to

prove the elements of the claim.  However, the complaint must allege sufficient facts to establish

those elements."  *Walters*, 684 F.3d at 439 (citation omitted).  "Thus, while a plaintiff does not

need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must

advance the plaintiff's claim 'across the line from conceivable to plausible.'"  *Id.* (quoting

*Twombly*, 550 U.S. at 570).

   In considering a Rule 12(b)(6) motion, the court need not always limit its review to the

pleadings.  It can also take judicial notice of public records, including statutes, and can "consider

documents incorporated into the complaint by reference, as well as those attached to the motion

to dismiss, so long as they are integral to the complaint and authentic."  *United States ex rel.*

*Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014)

(citations and internal quotation marks omitted).

**Count One: Truth in Lending Act**

   The plaintiffs first assert several violations of the Truth in Lending Act ("TILA"), 15

U.S.C. §§ 1601-1667f.  Congress passed TILA "to assure a meaningful disclosure of credit terms

so that the consumer will be able to compare more readily the various credit terms available to

him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and

unfair credit billing and credit card practices."  15 U.S.C. § 1601(a).  "As such, TILA requires

that a creditor make certain material disclosures at the time [a] loan is made." *Gilbert v. Residential Funding LLC*, 678 F.3d 271, 276 (4th Cir. 2012) (citing 15 U.S.C. § 1638(a)).  These disclosures include, among other things, the amount financed, the finance charge, and the annual percentage rate.  *See* 15 U.S.C. § 1638(a)(2)-(4).

The Federal Reserve Board implemented TILA through a regulation known as Regulation Z, codified at 12 C.F.R. § 226.  *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 557 (1980).  Regulation Z elaborates on the form and timing of disclosures, requiring that the creditor "make the disclosures . . . clearly and conspicuously in writing, in a form that the consumer may keep," 12 C.F.R. § 226.17(a)(1), and that the creditor do so "before consummation of the transaction," 12 C.F.R. § 226.17(b).  *See also Polk v. Crown Auto, Inc.*, 221 F.3d 691, 692 (4th Cir. 2000) ("[W]ritten disclosure in the *form* specified in subpart (a) must be provided to the consumer at the *time* specified in subpart (b).").  "Consummation means the time that a consumer becomes contractually obligated on a credit transaction."  12 C.F.R. § 226.2(a)(13).

The plaintiffs' first asserted TILA violation centers on the timing of the Dealership's disclosures.  Specifically, the plaintiffs allege that a Dealership employee "held" and "retained control" of the RISC (which contained the TILA disclosures) while instructing the plaintiffs where to initial and sign, "precluding [the] plaintiffs from reading the documents . . . ."  (Am. Compl. ¶ 10.)  Therefore, the plaintiffs conclude, the Dealership did not "provide the documents to [them] for review prior to or during execution."  (*Id.*)

The Official Staff Interpretations of Regulation Z[3] ("the Interpretations") make clear that the plaintiffs have stated a claim as to the timing of their receipt of the TILA disclosures:

> Creditors are not required to give the consumer two separate copies of the document before consummation, one for the consumer to keep and a second copy for the consumer to execute.  The disclosure requirement is satisfied if the creditor gives a copy of the document containing the unexecuted credit contract and disclosures to the consumer to read and sign; and the consumer receives a copy to keep at the time the consumer becomes obligated.  *It is not sufficient for the creditor merely to show the consumer the document containing the disclosures before the consumer signs and becomes obligated.  The consumer must be free to take possession of and review the document in its entirety before signing*.

12 C.F.R. Pt. 226, Supp. I, Subpt. C, Section 226.17, 17(b) ¶ 3 (emphasis added).

The plaintiffs allege they were not given the RISC until after they had executed it. Instead, they say, a Dealership employee held onto the RISC, prevented them from reading it, and merely instructed them where to initial and sign.  These allegations suggest the plaintiffs were not "give[n] a copy" of the RISC "to read" before executing it and were not "free to take possession of and review the [RISC] in its entirety before signing."  The Dealership relies on language in the RISC indicating that the plaintiffs confirmed their opportunity to review its content.  But this argument ignores the substance of the plaintiffs' allegations: they say they never saw crucial content within the RISC because a Dealership employee directed them to initial and sign it without first showing them TILA-required disclosures.  The court therefore will deny the Dealership's motion to dismiss the plaintiffs' claim asserting a TILA disclosure timing violation.[4]

---

[3] "Like Regulation Z itself, this commentary is authoritative," *Acosta v. Target Corp.*, 745 F.3d 853, 858 (7th Cir. 2014), because "Federal Reserve Board staff opinions construing [TILA] or Regulation [Z] should be dispositive" unless "demonstrably irrational."  *Ford Motor Credit Co.*, 444 U.S. at 565.

[4] The parties disagree on the appropriate weight to afford *Tripp v. Charlie Falk's Auto Wholesale Inc.*, 290 F. App'x 622 (4th Cir. 2008) (unpublished).  In *Tripp*, an auto dealership employee "presented and explained" several documents to the purchasers of a vehicle.  *Id.* at 624.  The purchasers argued the dealership violated TILA by not giving them physical possession of the documents.  *Id.* at 627.  The Court held that the dealership "provided the

The plaintiffs next assert a TILA violation based on the content of the Dealership's disclosures. TILA provides that on request, a creditor must provide a written itemization of the amount financed that includes "each amount that is or will be paid to third persons by the creditor on the consumer's behalf, together with an identification of or reference to the third person." 15 U.S.C. § 1638(a)(2)(B)(iii).[5] Here, the second page of the RISC contains a section titled "ITEMIZATION OF AMOUNT FINANCED." (ECF No. 8-1, at 2.) Under the heading "Other Charges Including Amounts Paid to Others on Your Behalf," an "Optional Gap Contract" ("the GAP contract") appears with an accompanying charge of $499. (*Id.*) "When a vehicle is totaled, 'GAP insurance' ('Guaranteed Auto Protection' insurance) pays off the consumer's outstanding loan balance if the reimbursement by the consumer's property damage insurance carrier is insufficient." *Gibson v. LTD, Inc.*, 434 F.3d 275, 277 n.1 (4th Cir. 2006).

The plaintiffs argue that under TILA, the Dealership was required to disclose the identity of the insurance company responsible for the GAP coverage because the Dealership paid $499 to

---

transaction documents and credit disclosures" to the purchasers before signing, and the purchasers "had the opportunity to read the documents before signing." *Id.* Aside from the fact that *Tripp* is unpublished, it is factually distinguishable. The plaintiffs here have alleged that (1) to the extent a Dealership employee "explained" the content of the RISC to them, that explanation misrepresented the RISC's content, and (2) the Dealership employee physically manipulated the RISC to prevent the plaintiffs from seeing key information contained within. Neither circumstance existed in *Tripp*.

The Dealership also argues the Interpretations abrogated *Polk*, 221 F.3d at 691, which found a TILA violation where a car dealership explained credit terms to a buyer but did not disclose those terms in a writing the buyer could take with him prior to transaction's consummation. The Dealership misunderstands *Polk*'s holding. *Polk* did not hold that the document containing TILA-required disclosures must be separate from the credit contract. Rather, *Polk* held that the creditor must make the required disclosures in writing, in a form the consumer may keep, before the consummation of the transaction. *Id.* at 692. This holding is entirely consistent with the Interpretations' clarification that "[c]reditors are not required to give the consumer two separate copies of the document before consummation, one for the consumer to keep and a second copy for the consumer to execute." 12 C.F.R. Pt. 226, Supp. I, Subpt. C, Section 226.17, 17(b) ¶ 3. The Dealership fails to recognize that a creditor must still "give[ ]" a copy of the document to the consumer before the transaction's consummation. *Id.* As discussed above, the plaintiffs allege they were not were not "give[n] a copy" of the RISC until after they had signed it, and the Dealership's argument therefore fails.

[5] The parties do not address whether the Dealership provided the plaintiffs with a statement of their "right to obtain, upon a written request, a written itemization of the amount financed," 15 U.S.C. § 1638(a)(2)(B), or whether the plaintiffs made such a request. The Interpretations clarify, however, that the "creditor may provide an itemization as a matter of course, without notifying the consumer of the right to receive it or waiting for a request." 12 C.F.R. Pt. 226, Supp. I, Subpt. C, Section 226.18, 18(c) ¶ 2.

that company on the plaintiffs' behalf.  The Dealership counters that (1) TILA's disclosure requirements were not implicated because the GAP contract was with the Dealership rather than a third party; (2) the plaintiffs signed and received the GAP contract; and (3) the $499 GAP charge was not paid to a third party on the plaintiffs' behalf.  The court need not address these arguments because both the plaintiffs and the Dealership have overlooked Regulation Z's exclusion of insurance companies from TILA's disclosure requirements concerning the itemization of amount financed.  *See* 12 C.F.R. § 226.18(c)(1)(iii) n.41 ("The following payees may be described using generic or other general terms and need not be further identified: public officials or government agencies, credit reporting agencies, appraisers, and insurance companies."); 12 C.F.R. Pt. 226, Supp. I, Subpt. C, Section 226.18, 18(c)(1)(iii) ¶ 2 ("Except for insurance companies and other categories noted in footnote 41, third parties must be identified by name.").  The plaintiffs' TILA claim based on the Dealership's failure to identify the insurance company responsible for GAP coverage within the itemization of amount financed therefore fails.

The plaintiffs' third TILA claim concerns the fact that the Dealership charged the plaintiffs $9,696 instead of $5,995, the price the plaintiffs found advertised on the internet after signing the RISC.  The plaintiffs say they should have been charged the lower price, and seek compensation for the additional $222 they were charged in sales tax for purchasing the vehicle at the higher price.  TILA provides no remedy to recover the difference between sales tax charged on the purchase price and sales tax that would have been charged on an advertised price discovered by the consumer post-purchase.  The court therefore will dismiss the plaintiffs' TILA claim for the additional $222 in sales tax they say they were charged.

The plaintiffs' fourth and final TILA claim concerns the down payment agreement, signed by the plaintiffs as an addendum to the RISC.  The RISC stated that the total down payment was $2,000, with $1,200 to be paid in cash and $800 "[d]eferred."  (ECF No. 8-1, at 2.)  The down payment agreement clarified that the due date for this deferred payment was March 11, 2014, and stated that the agreement was an addendum to the RISC.  (ECF No. 8-5.)  Regulation Z provides that "[a] deferred portion of a downpayment may be treated as part of the downpayment if it is payable not later than the due date of the second otherwise regularly scheduled payment and is not subject to a finance charge."  12 C.F.R. § 226.2(a)(18).  The plaintiffs do not allege a violation of this provision.  Neither do they specify any other provision in TILA or Regulation Z implicated here.  This claim therefore fails, and will be dismissed.

**Count Two: Deceit by Non-Disclosure or Concealment**

The plaintiffs also assert a claim for "deceit by non-disclosure or concealment."[6]  The parties, however, agree that this claim is better treated as one for fraud.  *See Sass v. Andrew*, 832 A.2d 247, 261 (Md. Ct. Spec. App. 2003) ("'Fraud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'") (citation omitted).

> To prove an action for civil fraud based on affirmative misrepresentation, the plaintiff must show that (1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation.

---

[6] The tort of deceit, also referred to as concealment or non-disclosure, consists of the following elements: (1) the defendant owed a duty to plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive plaintiff; (4) the plaintiff took action while justifiably relying on the concealment; and (5) the plaintiff suffered damages from the defendant's concealment.  *Lubore v. RPM Associates, Inc.*, 674 A.2d 547, 555 (Md. Ct. Spec. App. 1996).

*Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005).  The plaintiffs argue the Dealership committed fraud by telling them their monthly payments would be $300, but providing them a contract requiring monthly payments of $882.81.[7]  The plaintiffs say they relied on this misrepresentation in deciding to buy the vehicle, and suffered damages as a result.[8]

The Dealership makes two arguments in response.  First, the Dealership argues the plaintiffs did not have the right to rely on the misrepresentation because it contradicted the terms of the RISC.  The general rule in Maryland is that when determining whether a plaintiff's reliance on a misrepresentation was reasonable (i.e., whether the plaintiff had a right to rely on it), courts must "view the act [constituting misrepresentation] in its setting, which will include the implications and promptings of usage and fair dealing."  *Sass*, 832 A.2d at 267 (citation and internal quotation marks omitted).  "[T]he background and experience of the party that relied upon the representation [are] relevant" to this inquiry.  *Goldstein v. Miles*, 859 A.2d 313, 333 (Md. Ct. Spec. App. 2004).  The Dealership contends this rule does not apply where a misrepresentation is contradicted by the express terms of an agreement.

The Court of Appeals of Maryland has not squarely addressed whether, in an action for fraud, reliance on a misrepresentation is always unreasonable where the misrepresentation directly contradicts a contractual term.  In *James v. Goldberg*, 261 A.2d 753 (Md. 1970), however, the Court of Appeals of Maryland appeared to endorse a fact-based inquiry instead of a

---

[7] The plaintiffs also argue the Dealership committed fraud by charging them $9,696 instead of $5,995, the price they later found advertised online.  This allegation fails to state a fraud claim because it contains no misrepresentation.

[8] The plaintiffs are less than clear as to their precise injury.  Their amended complaint does not allege that the Dealership refused to return their $1,200 down payment, and does not allege that the vehicle was repossessed (and if so, when).  In their response to the Dealership's motion to dismiss, however, they state they were unable to "make the Pickup Payment of $800.00 . . . and Berman's repossessed The Vehicle on or about March 27, 2014," and "Berman's has retained [their] down payment of $1,200.00 . . . ." (Pls.' Resp. Mot. Dismiss 2, 19.)  These statements are not evidence, and more factual development is necessary on the precise injury the plaintiffs suffered.

per se rule.  There, the defendant lessee of office space entered into an agreement assigning the

right to use that space to the plaintiff despite a provision in the original lease (which was

attached to the agreement) barring assignment without the lessor's written consent.  *Id.* at 755.

No such consent was obtained, and a dispute resulted; the plaintiff believed he was the lessor's

tenant because the defendant had assigned him the entire lease, and the defendant believed the

plaintiff was his tenant because the defendant had only agreed to a partial assignment.  *Id.* at 756.

In assessing the reasonableness of the plaintiff's reliance on the defendant's alleged

misrepresentation that he would assign the entire lease to the plaintiff, the court noted that

because the plaintiff was a law school graduate, he "must have known by reading the lease, that

written consent by the landlords to the assignment or subtenancy was necessary to make him a

tenant of the landlord . . . ."  *Id.* at 758.  Thus, the court looked to context—including the

plaintiff's background—rather than the mere existence of a contradictory contractual provision.

Further, the Court of Special Appeals of Maryland has recognized that "in certain

instances, fraud can be premised on representations that are inconsistent with a written

agreement . . . ."  *First Union Nat. Bank v. Steele Software Sys. Corp.*, 838 A.2d 404, 441-42

(Md. Ct. Spec. App. 2003).  One such instance appeared in *Parker v. Columbia Bank*, 604 A.2d

521 (Md. Ct. Spec. App. 1992).  *Parker* addressed a situation where home buyers filed suit

against a bank for fraud concerning a residential construction loan.  *Id.* at 523.  The defendants

argued it was inherently unreasonable to rely on a representation contradicted by the loan

agreement's express terms, and that parol evidence of the alleged misrepresentations was

therefore inadmissible.  *Id.* at 529.  The court reversed the trial court's grant of a motion to

dismiss, holding that the parol evidence rule did not bar "evidence as to any assertedly fraudulent

misrepresentations." *Id.*  Though "[t]he terms of a written contract can, of course, be used as

evidence of the reasonableness of . . . reliance upon alleged misrepresentations contrary to those

terms," an assessment of that reasonableness was not proper at the motion-to-dismiss stage. *Id.*

at 530. *See also id.* at 529 ("We cannot find, at this stage in the proceedings, however, that

reliance on these representations by the Parkers, who were not commercial borrowers but

allegedly unsophisticated and inexperienced residential borrowers, is unreasonable as a matter of

law.").

Fourth Circuit cases addressing the issue have also looked to reliance on statements

contradicted in written agreements as a factor in determining reasonableness, rather than as an

absolute bar.  *See, e.g., Foremost Guar. Corp. v. Meritor Sav. Bank*, 910 F.2d 118, 125 (4th Cir.

1990) (looking to an agreement's context and the plaintiff's background as factors in

determining the reasonableness of reliance on statements contradicting the agreement's terms);

*Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 631-32 (4th Cir. 1977) (as an alternate basis for

concluding that a fraud claim failed as a matter of law, holding that the plaintiffs could not

"reasonably have relied upon the allegedly fraudulent statements made in the face of plainly

contradictory contractual language," but noting that circumstances may "exist in which the rule

may be relaxed for limited purposes").

Accordingly, the court concludes that the mere fact that the alleged misrepresentation

here contradicted the RISC's terms does not present an absolute bar to the plaintiffs' fraud claim,

particularly given the plaintiffs' statement in their response to the Dealership's motion to dismiss

that they are "both young and inexperienced in the art of purchasing a used car," (Pls.' Resp.

Mot. Dismiss 1), and their allegations that a Dealership employee prevented them from

reviewing the RISC before signing it. Rather, the plaintiffs must put forth evidence, following discovery, establishing their right to rely on the alleged misrepresentation that monthly payments would be $300 in the face of the RISC's provision requiring monthly payments of $882.81.[9]

The Dealership's second argument is that the plaintiffs failed to plead with particularity in accordance with Federal Rule of Civil Procedure 9(b). Rule 9(b) "requires a plaintiff to plead 'with particularity the circumstances constituting fraud.'" *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (quoting Fed. R. Civ. P. 9(b)). These "circumstances include the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* (citation and internal quotation marks omitted). *See also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). The purposes of Rule 9(b) are to provide notice to a defendant of its alleged misconduct, prevent frivolous suits, eliminate fraud actions in which all the facts are learned after discovery, and protect defendants from harm to their goodwill and reputation. *U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 456 (4th Cir. 2013). "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that [the] plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

The Dealership argues that the plaintiffs failed to identify the names of the salesperson

---

[9] The Dealership argues that "[u]nder Maryland contract law, the general rule is that 'a party who signs a contract is presumed to have read and understood its terms and that the party will be bound by them when the document is executed.'" (Def.'s Mot. Dismiss 12 (citing *Dashiell v. Meeks*, 913 A.2d 10, 20 (Md. 2006).) The plaintiffs assert a fraud claim, not a contract claim, and contract cases are therefore not determinative of the issue here.

and finance person who allegedly told them that monthly payments would be $300, and instead lump these two Dealership employees' statements together "without differentiating each's role or participation in the alleged fraud." (Def.'s Mot. Dismiss 11.) The Dealership cites no authority to support the position that where fraud is alleged against a small business, identifying that business's employees by position, rather than by name, is insufficient to satisfy the requirements of Rule 9(b). Further, the plaintiffs differentiate the statements and actions of the salesperson and finance person. As to the salesperson, the plaintiffs allege they told him "they could not afford payment greater than $300.00 per month[,] and he replied the payments would be about $300.00 - $301.00 a month for 36 months." (Am. Compl. ¶ 7.) As to the finance person, the plaintiffs allege that before signing the RISC they "asked the woman Finance Person if the payments are under $300.00 per month," and she replied that "once the balance of the down payment is made it will be right around $300.00 per month." (*Id.* ¶ 9.) Finally, they allege that the finance person "retained control of each sheet" of the RISC while instructing the plaintiffs where to sign and initial, (*id.* ¶ 10), and "only exposed the area of each sheet of paper that required plaintiffs' initial and/or signature," (*id.* ¶ 11). The plaintiffs thus differentiate the role each employee played in the alleged fraud. Accordingly, the court will not dismiss the plaintiffs' fraud claim at this stage.

**Count Three: Negligent Misrepresentation**

The plaintiffs also assert a negligent misrepresentation claim. In Maryland, the tort of negligent misrepresentation contains the following five elements:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
> (2) the defendant intends that his statement will be acted upon by the plaintiff;

14

> (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;
> (4) the plaintiff, justifiably, takes action in reliance on the statement; and
> (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Martens Chevrolet, Inc. v. Seney*, 439 A.2d 534, 539 (Md. 1982).

The Dealership argues that because the plaintiffs' claim concerns an alleged promise that Dealership employees did not intend to perform at the time they made it, "the appropriate legal claim is for fraudulent misrepresentation and not negligent misrepresentation." (Def.'s Mot. Dismiss 13.) When a "promissory" or "predictive" statement is made "with present knowledge that the predicted event will not occur," that statement "is an intentional misrepresentation, not a negligent one, and thus cannot sustain an action for negligent misrepresentation." *Miller v. Fairchild Indus., Inc.*, 629 A.2d 1293, 1304 (Md. Ct. Spec. App. 1993). But the plaintiffs do not allege a "promissory" or "predictive" statement. Rather, they allege that Dealership employees misrepresented central, then-existing terms of the RISC: the monthly payment amount and the length of the payment term. Maryland law does not prohibit them from pleading both fraud and negligent misrepresentation. *See Martens Chevrolet*, 439 A.2d at 539 ("Nothing prohibits a plaintiff from pleading both deceit and negligent misrepresentation in one declaration and then relying on the same nucleus of facts in an attempt to satisfy the differing burdens of proof on these alternative claims."). The court therefore will not dismiss the plaintiffs' negligent misrepresentation claim at this time.

**Count Four: Md. Code Ann., Com. Law § 12-604 and Md. Code Regs. § 11.12.01.15(A)**

Count Four of the plaintiffs' Amended Complaint asserts a violation of § 12-604 of the Maryland Commercial Law Code and § 11.12.01.15(A) of the Code of Maryland Regulations. Section 12-604, part of Maryland's Retail Installment Sales Act ("RISA"), Md. Code Ann.,

Com. Law §§ 12-601–12-636, provides that "[a]n installment sale agreement shall be evidenced by an instrument in writing which contains all of the agreements of the parties," and "be signed by all parties before the seller delivers to the buyer any of the goods covered by the agreement." Md. Code Ann., Com. Law § 12-604.  Section 11.12.01.15(A), which contains nearly identical language, provides that "[e]very vehicle sales contract or agreement shall be evidenced by an instrument in writing containing all of the agreements of the parties," and "be signed by all parties before the seller delivers to the buyer the vehicle covered by the agreement."  Md. Code Regs. § 11.12.01.15(A).  The plaintiffs argue the Dealership violated § 12-604 and § 11.12.01.15(A) because the one-page down payment agreement was separate from the RISC. (*See* ECF No. 8-5 (down payment agreement).)

The Dealership responds that because the RISC provided it was subject to the Maryland Credit Grantor Closed End Credit Provisions ("CLEC"), Md. Code Ann., Com. Law §§ 12-1001–12-1029, the RISA is irrelevant.  "In Maryland, when the purchase of a motor vehicle is financed by an installment sale, the lender may elect for the contract to be governed by either . . . the [CLEC], or the [RISA]." *Patton v. Wells Fargo Fin. Maryland, Inc.*, 85 A.3d 167, 169-70 (Md. 2014).  If the lender chooses the CLEC, "it is to do so by written election in the loan contract." *Id.* (citing Md. Code Ann., Com. Law § 12-1013.1(a)(2)). *See also Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 328 (4th Cir. 2012) ("[A] lending agreement must specifically state that the CLEC applies in order for the provisions of the CLEC to govern that agreement.  Otherwise, the RISA applies.").

The RISC stated that it "shall be subject to the Credit Grantor Closed End Credit Provisions (Subtitle 10) of Title 12 of the Commercial Law Article of the Maryland Code," i.e.,

the CLEC.  (ECF No. 8-1, at 4.)  The plaintiffs concede that the CLEC governed the transaction.  (*See* Pls.' Resp. Mot. Dismiss 16 n.1 & 30 n.2 (noting that the CLEC "was elected by the car dealer and applies to this transaction").)  Thus, § 12-604 of the Maryland Commercial Law Code, which is part of the RISA, does not apply, and the plaintiffs' claim under that section will be dismissed.

The Dealership apparently does not argue that the CLEC also preempts § 11.12.01.15(A) of the Code of Maryland Regulations, but the plaintiffs' claim under that regulation fails regardless.  As noted above, the down payment agreement clarified that the due date for the $800 deferred portion of the plaintiffs' $2,000 down payment was March 11, 2014, and stated that the agreement was an addendum to the RISC.  The plaintiffs cite no authority suggesting that a down payment agreement clarifying the date by which a buyer must pay a deferred payment violates § 11.12.01.15(A) when the down payment agreement is characterized as an "addendum" to the RISC rather than as part of the RISC itself.  Rather, they cite a number of cases analyzing the enforceability of an arbitration provision contained in an agreement signed prior to the signing of a RISC.  *See, e.g.*, *Tokarski v. Castle Auto Outlet, LLC*, RDB-09-509, 2009 WL 8711121 (D. Md. Sept. 25, 2009) (holding that a buyer's order containing an arbitration clause was superseded by a RISC without one).  Neither party has suggested this case must be arbitrated, and those cases are inapposite.[10]  Accordingly, the court will also dismiss the plaintiffs' claim under § 11.12.01.15(A) of the Code of Maryland Regulations.

**Count Five: Maryland Consumer Protection Act**

Finally, the plaintiffs allege the Dealership committed unfair and deceptive trade

---

[10] The court also notes that the plaintiffs do not allege the down payment agreement's content was concealed from them in the way they allege the RISC's content was concealed.  And though the plaintiffs allege they "have suffered monetary damages" from the clarification that the due date for the deferred payment was March 11, 2014, they make no allegations as to how.  (Am. Compl. ¶ 59.)

practices in violation of Maryland's Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law §§ 13-101–13-501.  The MCPA bars "unfair or deceptive trade practice[s]," Md. Code Ann., Com. Law § 13-303, and defines such practices to include, among other things, false statements with "the capacity, tendency, or effect of deceiving or misleading consumers," *id.* § 13-301(1), and deception, fraud, misrepresentation, or knowing concealment in connection with the sale of consumer goods, *id.* § 13-301(9).  The MCPA "constitutes remedial legislation that is intended to be construed liberally in order to promote its purpose of providing a modicum of protection for the State's consumers."  *Washington Home Remodelers, Inc. v. State, Office of Attorney Gen., Consumer Prot. Div.*, 45 A.3d 208, 219 (Md. 2012).

The plaintiffs make two factual allegations that the Dealership violated the MCPA.  First, they say that Dealership employees told them the vehicle's price "would be fair," and they relied on this "misrepresentation" when agreeing to pay $9,696 instead of $5,995, the price they later discovered online.  (Am. Compl. ¶ 72.)  The MCPA bars advertisement "[w]ithout intent to sell, lease, or rent" consumer goods as advertised, or "[w]ith intent not to supply reasonably expected public demand . . . ."  Md. Code Ann., Com. Law § 13-301(5)(i)-(ii).  The plaintiffs cite no MCPA provision entitling a buyer to relief after purchasing a product later found advertised for a lower price.[11]  Accordingly, this factual allegation fails to state a claim under the MCPA.

The plaintiffs' second allegation is that they "relied on the misrepresentations" of Dealership employees who told them that "monthly payments would be $300 . . . for 36 months." (Am. Compl. ¶ 71.)  The Dealership argues that the plaintiffs' failure to cite specific MCPA provisions falls short of both general pleading requirements and the heightened pleading

---

[11] Further, the internet advertisements the plaintiffs attach as support state that the lower advertised price is the "[i]nternet price only," and "[a]ssumes cash or minimum 700 qualifying credit score."  (Pls.' Resp. Mot. Dismiss Exs. 6, 7.)  The plaintiffs allege use of financing and make no allegation concerning their credit score.

requirements of Federal Rule Civil Procedure 9(b).  Though the plaintiffs do not cite a specific subsection of § 13-301, their factual allegations suffice to put the Dealership on notice that they have alleged a violation of § 13-301(1), which bars false or misleading oral statements, and § 13-301(9), which bars deception, fraud, misrepresentation, or knowing concealment in connection with the sale of consumer goods.  And though an MCPA claim sounding in fraud "is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)," *Spaulding*, 714 F.3d at 781, the court has already determined that the plaintiffs' fraud allegations satisfy Rule 9(b).  The court therefore will not dismiss this MCPA claim at this time.[12]

## CONCLUSION

For the reasons stated above, the court will deny as moot the Dealership's motion to dismiss the plaintiffs' original complaint, grant in part and deny in part the Dealership's motion to dismiss the plaintiffs' amended complaint, and deny the plaintiffs' cross motion for summary judgment.  A separate order follows.

November 4, 2014                                      /S/
        Date                                                Catherine C. Blake
                                                            United States District Judge

---

[12] Plaintiffs' counsel's submissions to the court contained multiple typographical, spelling, and grammatical errors.  The court advises counsel to better proofread his documents before filing, as his failure to do so places an extra burden on the court and does not contribute to his arguments.