IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANTHONY PRICE, et al., | * | |
| Plaintiffs | * | |
| v. | * | Civil Case No. 14-763-JMC |
| BERMAN'S AUTOMOTIVE, INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \*

## MEMORANDUM OPINION

### I. PROCEDURAL POSTURE

This matter was originally filed on March 12, 2014 and stems from the Plaintiffs' purchase of an automobile from Defendant on February 25, 2014. The original Complaint included claims for violations of the Truth in Lending Act, 15 U.S.C. §1601–1667f ("TILA"), the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101–13-501, and the Uniform Commercial Code ("UCC") § 2-608. (Compl., ECF No. 1.) Jurisdiction in this Court was premised on 15 U.S.C. § 1640 and 28 U.S.C. §§ 1331 and 1367.

The Complaint was amended on May 7, 2014 to add counts for common law deceit by non-disclosure or concealment and negligent misrepresentation, violation of Code of Maryland Regulations ("COMAR") § 11.12.01.15(A), and violation of Maryland Code Annotated, Commercial Law § 12-694. The UCC count was dropped. (Am. Compl., ECF No. 6.)

By order dated November 4, 2014, Chief Judge Blake of this Court granted, in part, Defendant's Motion to Dismiss. As a result of this order, the remaining counts consisted of: a violation of TILA's "timing" requirement regarding disclosures,[1] the common law deceit claim,

---

[1] Plaintiffs' remaining TILA theories were dismissed.

better treated as a claim for fraud, the negligent misrepresentation claim, and part of the Maryland Consumer Protection Act claim.[2] (Mem., Nov. 4, 2014, ECF No. 10.)

The parties consented to proceed before a United States Magistrate Judge on December 16 and 17, 2014. (ECF Nos. 20, 22.) Defendant moved for summary judgment on the remainder of the Amended Complaint on July 17, 2015. (ECF. No. 27.) This Court granted Defendant's motion in part on September 28, 2015. (ECF No. 33.) As a result of that order, Plaintiffs' claims were further narrowed. Plaintiffs' TILA claim was limited to their actual damages (the failure of Defendant to return their $1200 deposit), and their fraud/deceit, negligent misrepresentation, and Maryland Consumer Protect Act claims remained.

On or about October 21, 2015, Defendant apparently tendered the $1200.00 plus interest to Plaintiffs and, on February 2, 2016, Defendant moved to dismiss based on lack of subject matter jurisdiction. (ECF No. 40.) By order dated March 21, 2016, this Court denied Defendant's motion without prejudice, instructing Defendant that if it submitted proof of delivery of a cashier's check in the amount of $1200.00 plus interest, the TILA claim, the negligent misrepresentation claim, and the Maryland Consumer Protection Act claim would be dismissed for mootness. (ECF No. 45.) The Court further indicated that it would retain jurisdiction over the remaining fraud claim to the extent it alleged punitive damages, under its supplemental jurisdiction.

On May 4, 2016, Defendant filed another motion to dismiss for mootness, having followed the Court's instructions set forth in its March 21, 2016 order. (ECF No. 49.) By order

---

[2] Chief Judge Blake dismissed that part of the Maryland Consumer Protection Act claim based on the difference between the price Plaintiffs' paid for the vehicle and a price Plaintiffs' subsequently found on the internet for the same vehicle, but she allowed that part of the claim based on a difference between the financing initially promised and the financing that the sales documents set forth.

dated May 27, 2016, this Court dismissed as moot all remaining claims except Plaintiffs' claim for punitive damages under their common law fraud theory.[3]

A trial on this remaining theory was held on June 13, 2016. For the reasons stated below, the Court finds no liability for punitive damages for fraud and enters judgment on behalf of Defendant. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court's findings of fact, legal analysis and conclusions of law are set forth separately below.

## II. FINDINGS OF FACT

1. Plaintiff Anthony Price is 26 years old. He did not finish high school and left in the 11th grade. He has been employed as a line cook since then. His partner, Virginia Aldrich, is 28 years old. She left high school in the 10th grade and has been employed as a bartender since then.

2. On February 25, 2014, Mr. Price and Ms. Aldrich decided to try to purchase a vehicle. After being told by one dealership that their credit was not good enough, they were directed by that dealership to Berman's Automotive ("Berman's").

3. Mr. Price and Ms. Aldrich arrived at Berman's at 6 or 7 p.m. on February 25, 2014. They told unknown Berman's personnel that they were looking for an SUV and were then introduced to an unknown Berman's salesman.

4. Mr. Price and Ms. Aldrich looked at several vehicles on the lot with the Berman's salesman and told him that they had $1200.00 with them for a down payment and were looking to pay no more than $300.00/month for a vehicle. The Berman's salesman said that Berman's had vehicles within that range, and after a test drive, Mr. Price and Ms. Aldrich decided to purchase a 2003 Jeep Cherokee.

---

[3] The Court noted that even though Defendant's tender mooted actual damages under the fraud claim, such a tender did not moot a punitive damages recovery pursuant to the Maryland Court of Appeals' ruling in Frazier v. Castle Ford, Ltd., 59 A.3d 1016, 1026-27 (Md. 2013).

5. Mr. Price and Ms. Aldrich agreed to purchase the Jeep and Berman's agreed to sell them the Jeep for a total price of $11,318.76 (including tax, various fees and costs), consisting of a down payment of $2000.00, and $9,318.76 to be financed at a payment of approximately $300.00/month for 36 months.

6. Mr. Price and Ms. Aldrich could not pay the full $2000.00 down payment on February 25, 2014 because they only had $1200.00 with them. Mr. Price and Ms. Aldrich agreed with Berman's to pay the remaining $800.00 of the $2000.00 down payment by March 11, 2014.

7. Mr. Price and Ms. Aldrich signed at least one unidentified document with the Berman's salesman. The salesman told them that he was going to get someone from the Berman's Finance Department to finish their paperwork.

8. Mr. Price and Ms. Aldrich went to the office of Berman's Finance Manager, Ms. Nathlee Miales, to complete their paperwork for the purchase of the Jeep. Ms. Miales has worked for Berman's for five years and has been involved in automobile financing for various dealerships for 20 years.

9. Ms. Miales understood that Mr. Price and Ms. Aldrich had only $1200.00 with them, had agreed to pay the remaining $800.00 of the down payment by March 11, 2014, and could only afford payments of around $300.00/month. Ms. Miales further understood that Mr. Price and Ms. Aldrich were going to take the Jeep home with them that day (February 25, 2014).

10. Ms. Miales does not negotiate terms of sale nor does she obtain financing approval for buyers. That is done by Berman's General Manager before Ms. Miales generates a customer's paperwork. The terms are communicated to Ms. Miales through a "worksheet" from Berman's General Manager.

11.     Loan approval for financing at $300.00/month for 36 months with a $2000.00 down payment (the "36-month financing") had already been obtained from a third-party lender by the General Manager prior to Ms. Miales dealing with Mr. Price and Ms. Aldrich.  She confirmed the terms of the 36-month financing with Mr. Price and Ms. Aldrich by going over the "worksheet" from the General Manager with them.  Ms. Miales confirmed with Mr. Price and Ms. Aldrich that once the balance of the $2000.00 down payment was paid, the payments on the Jeep would be $300.00/month.[4]

12.     Ms. Miales could not finalize the 36-month financing until Mr. Price and Ms. Aldrich paid the remaining $800.00 of the $2000.00 down payment required by the third-party lender.

13.     Because Mr. Price and Ms. Aldrich nonetheless wanted to take the vehicle home with them the evening of February 25, 2014, Ms. Miales, consistent with Berman's typical practice in such situations, generated interim paperwork, putting contingency terms and conditions in place to establish the parties' rights and responsibilities regarding the Jeep until the remaining $800.00 was paid and the 36-month financing could be substituted (i.e., by March 11, 2014), or in the event that the remainder of the down payment was never paid.

14.     Unlike the third-party lender, Berman's was willing to allow a deferral of the remainder of the down payment for the period of time where it remained the lien holder, i.e., until the third-party lender could be substituted as lien holder under the 36-month financing once the full $2000.00 down payment was paid.

15.     It is Berman's standard practice that the contingency terms and conditions include 12-month financing resulting, in this case, in monthly payments of $882.31/month (the "12-

---

[4] This is also consistent with the allegation in Plaintiffs' Amended Complaint that Ms. Miales told them "words to the effect" that *once the balance of the down payment was made*, the payments would be around $300.00/month. (Am. Compl. ¶9 (emphasis added)).

month financing"), with Berman's acting as the lienholder. However, it was Ms. Miales expectation that the 12-month financing would be replaced by the 36-month financing before any monthly payments were due; no payments under the 12-month financing were due until March 27, 2014, a date more than two weeks after the March 11, 2014 deadline for paying the remainder of the $2000.00 down payment and the contemplated substitution of the 36-month financing.

16.     If Berman's finalizes the 36-month financing with a third-party lender, Berman's is no longer the lienholder and gets paid the purchase price of the vehicle in lump sum by the third-party lender (with some deduction for fees).

17.     Mr. Price and Ms. Aldrich were presented with ten documents by Ms. Miales on February 25, 2014 to initial and/or sign and they complied.[5] Five of these documents specifically referenced aspects of the 12-month financing, and none of the paperwork reflected or referenced the 36-month financing. Ms. Miales planned to re-do the paperwork once Mr. Price and Ms. Aldrich paid the remainder of the down payment, allowing for the 36-month financing to replace the 12-month financing.

18.     Ms. Miales told Mr. Price and Ms. Aldrich that the reason she had generated paperwork reflecting the 12-month financing was because Mr. Price and Ms. Aldrich were taking the car home that day (February 25, 2014), and that once the remainder of the down payment was made, the agreed-to 36-month financing would be substituted.

---

[5] Specifically, Plaintiffs signed a two-page Purchase Agreement (Def. Ex. 1), initialed each page of a five-page Retail Installment Sale Contract and signed it on pages 3 and 5 (Def. Ex. 2), signed a one-page Down Payment Agreement (Def. Ex. 3), initialed each page of a three-page Credit Application and signed the last page, signed a two-page Deficiency Waiver Addendum (Def. Ex. 5), signed a one-page Contract Addendum for Tracking Device (Def. Ex. 6), singed a one-page Agreement to Provide Insurance (Def. Ex. 7), initialed and signed a two-page Buyer's Guide/Warranty (Def. Ex. 8), signed a one-page odometer statement (Dr. Ex. 9), and signed a one-page Disclosure of Credit Bureau.

19. Mr. Price and Ms. Aldrich did not fully understand the documents that they signed/initialed and did not understand that the documents committed them to the 12-month financing in the event they did not make the remainder of the down payment.

20. Ms. Miales did not intentionally obscure the substantive terms contained in the documents. However, from the way Ms. Miales held and presented the documents across her desk to Plaintiffs for initialing and/or signature, Mr. Price and Ms. Aldrich could not see all of the substantive terms on all of the documents presented.

21. Mr. Price and Ms. Aldrich did not tell Ms. Miales that the way she presented the documents did not allow them to see all of the substantive terms on all of the documents presented. They did not read nor ask to read any of the terms before initialing and/or signing the documents.

22. Mr. Price and Ms. Aldrich would not have agreed to pay $882.31/month as a monthly payment because they could not afford such a monthly payment.

23. Ms. Miales gave them copies of all the executed documents to take home with them.

24. It was not until Mr. Price and Ms. Aldrich returned home from Berman's that Ms. Aldrich read the substantive terms of the executed documents for the first time. She quickly realized that the documents did not reflect the 36-month financing, but instead reflected the 12-month financing. She also questioned the legality of the 12-month financing's interest rate of 23.99% but learned through internet research that this was the highest interest rate allowed under Maryland law.

25. Ms. Aldrich also researched the Jeep itself on the internet. She discovered that Berman's had advertised the Jeep at a lower purchase price ($5,995.00) than the price she and Mr. Price had agreed to.[6]

26. Mr. Price called Berman's the next day and spoke with an unidentified "manager" of Berman's. He told the manager that he had a few questions about the documentation surrounding the purchase of the Jeep. Mr. Price was told to come to the dealership with the documents. Mr. Price did so.

27. At Berman's, Mr. Price presented the documents to another unidentified Berman's representative and told him that the sales price did not match the price Ms. Aldrich found on the internet. Mr. Price did not mention to Berman's any issue with the monthly payments in the signed documents being different from the agreed-to 36-month financing.[7] He made no other complaints to Berman's.

28. In response to Mr. Price's complaint about the internet price difference, Berman's told Mr. Price that they were not going to change the transaction.

29. Mr. Price and Ms. Aldrich consulted a lawyer the following day.

30. Mr. Price and Ms. Aldrich did not pay the remaining $800.00 of the down payment.

31. Berman's repossessed the Jeep one to two weeks later.

32. Berman's did not return Plaintiffs' $1200.00 partial down payment initially. Well after the filing of the lawsuit, Defendant tendered to Plaintiffs $1200.00 plus interest.

---

[6] Various claims based on this price difference were previously dismissed by Judge Blake before the parties consented to my jurisdiction for all proceedings. (Mem., Nov. 4, 2014, 8, 10 n. 7, 18.)

[7] Ms. Aldrich was not present for that return visit. She testified, however, that it was her understanding that Plaintiff Price complained about the purchase price, the interest rate, and the monthly payments. Mr. Price's testimony, both on direct and cross examination, was that he spoke about the purchase price difference and did not talk about the monthly payments. This is also consistent with the allegations of the Amended Complaint. (Am. Compl. ¶ 19.)

33.     Plaintiffs suffered no other actual damages aside from the loss of the $1200.00 down payment until it was later tendered with interest after the filing of the lawsuit.

## III.  LEGAL ANALYSIS AND CONCLUSIONS OF LAW

This Court recently reviewed the legal requirements for fraud under Maryland law in <u>Due Forni LLC v. Euro Restaurant Solutions, Inc.</u>:

> To establish fraud, Maryland law requires a plaintiff to prove that:
> (1) the defendant made a false representation to the plaintiff;
> (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth;
> (3) the misrepresentation was made for the purpose of defrauding the plaintiff;
> (4) the plaintiff relied on the representation and had the right to rely on it; and,
> (5) the plaintiff suffered compensable injury as a result of the misrepresentation.

No. 13-cv-3861-PWG, 2016 WL 1222507, *2 (D. Md. Mar. 29, 2016).  Other than the measure of damages, the elements of fraud must be established by clear and convincing evidence. <u>Hoffman v. Stamper</u>, 867 A.2d 276, 300 (Md. 2005).  Clear and convincing evidence must be "clear" in the sense that it is certain, plain to the understanding, and unambiguous, and "convincing" in the sense that it is so reasonable and persuasive as to cause you to believe it. 1:13 Burden of Proof — Clear and Convincing Evidence Standard, MPJI-CV 1:13.  To recover punitive damages under a fraud theory, a Plaintiff must show "actual malice" which, in the context of a fraud case, means that the actual knowledge standard (rather than reckless indifference) must be satisfied in the second element.  <u>Ellerin v. Fairfax Savings</u>, F.S.B., 652 A.2d 1117, 1129 (Md. 1995).

In the present case, the trial testimony from both sides was that Mr. Price and Ms. Aldrich agreed to buy, and Berman's agreed to sell, the 2003 Jeep for a down payment of $2000.00 followed by monthly payments of $300.00/month for 36 months.  It was also undisputed at trial—consistent with Plaintiffs' Amended Complaint—that Berman's told the

Plaintiffs that the 36-month financing required that the full $2000.00 down payment be made.[8] (Am. Compl. ¶ 9, ECF No. 6). The trial evidence and testimony further established that (1) Plaintiffs had only $1200.00 on the date of purchase to put towards the down payment; (2) Plaintiffs were aware that they needed to pay the remaining $800.00 of the down payment by March 11, 2014.

The potential for fraud in this transaction stems from whether the promise of the 36-month financing was just a ruse by Berman's to get Plaintiffs to sign documents committing Plaintiffs to the 12-month financing. We will never know for sure whether Berman's would have followed through on the 36-month financing because Plaintiffs acknowledge that they never paid the remaining $800.00 of the down payment.

As for predicting what Berman's would have done, in examining the record, the evidence is mixed. On the one hand, beyond the testimony of Ms. Mailes, there was no evidence presented by Berman's at trial that referenced the 36-month financing or referred to the 12-month financing as "temporary" or "contingency" financing. The paperwork, to the extent it references payment terms and financing, references only the 12-month financing. Although Ms. Miales testified that a third-party lender had approved the 36-month financing (subject to the full $2000.00 payment being received), and that there was a "worksheet" consistent with these terms, there was no extrinsic evidence of that.

On the other hand, Plaintiffs did not present evidence that clearly contradicted Ms. Miales sworn testimony that: (1) Berman's needed paperwork in place to establish the rights and responsibilities of the parties in the short term because the Plaintiffs were taking the car with them that day despite not paying the full down payment as required by the third-party lender; (2)

---

[8] Ms. Miales testified that, unlike the third-party lender, Berman's would accept a deferral of the remainder of the down payment for that period of time when Berman's remained the lienholder prior to the substitution of the third-party lender.

no payments would fall due under that paperwork prior to the deadline for paying the remainder of the down payment (which is also consistent with the documentary evidence); (3) the paperwork that was signed was Berman's "standard" paperwork under such circumstances; and (4) the 36-month financing would have been substituted had the remaining down payment been paid. Additionally, Plaintiffs did not establish that there was a clear advantage to Berman's to prefer the 12-month financing that contemplated monthly payments that Plaintiffs could likely not have made (and for which Berman's held the risk as lien holder) over the 36-month plan under which Berman's would have been paid in full for the vehicle by the third-party lender (minus some fees), and would not have had the risk of servicing the loan of buyers with impaired credit.

Plaintiffs disputed Ms. Miales' trial testimony that she explained the need for contingency financing, and they testified that they had no understanding that the documents being presented for execution contemplated the 12-month financing with monthly payments of $882.31/month despite Ms. Miales' testimony that the specifically pointed those terms out in the documents. Further, Plaintiffs testified that they were unable to read the substantive terms of the documents because of the way they were presented by Ms. Miales across her desk for signature. At the same time, they admitted that they never informed Ms. Miales of this nor did they ever ask her to read any of the documents before signing them. Although this may lend some support to Plaintiffs' claim that they thought they were signing the 36-month financing, an equally plausible conclusion is that they made the judgment that the documents were not important to read because they would soon be replaced.[9] This latter scenario is further supported by the fact that when Mr. Price returned the next day to complain (now aware of the 12-month financing

---

[9] Once she did read the documents after leaving Berman's, Ms. Aldrich testified that she clearly understood the 12-month financing terms set forth in the documents. This negates the suggestion that the Plaintiffs' lack of formal education or prior purchase of a vehicle from a dealer interfered with their ability to assess the transaction.

terms), he only complained about the difference between the purchase price and internet price, not the 12-month financing, again suggesting the understanding that those documents would soon be replaced by new documents setting forth the 36-month financing.

Under the circumstances, Plaintiffs have not established by clear and convincing evidence that Berman's made a knowing false representation to them or otherwise deceived them into entering a transaction in the long term that was other than the 36-month financing contemplated by the parties had Plaintiffs performed as agreed and made the full $2000.00 down payment.  Similarly, Plaintiffs have not established by clear and convincing evidence that Berman's made a knowing false representation to them or otherwise deceived them into executing the 12-month financing documents to govern the rights and responsibilities of the parties in the interim or, as occurred here, in the event the remainder of the down payment was never made.  Although Plaintiffs may well have been unclear about all of the terms of the 12-month 'interim' financing that would govern in the short term (or if Plaintiffs failed to pay the remainder of the down payment), Plaintiffs have not established by clear and convincing evidence that this was due to any knowing deception by Berman's.  In the absence of establishing a knowing false statement or deception by clear and convincing evidence, Plaintiffs cannot recover punitive damages.

A judgment consistent with this opinion will be entered by the Court.

Dated: July 5, 2016                                         /s/
                                                          J. Mark Coulson
                                                          United States Magistrate Judge